IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES, for the use of CMARK ) | |
| INTERNATIONAL, INC., ) | |
|   ) | |
|    Plaintiff, ) | |
|   ) | |
| v. ) | CIVIL ACTION NO. 2:08cv517-SRW |
|   ) | |
| KELVIN THORINGTON, d/b/a ) | |
| THORINGTON ELECTRICAL ) | |
| CONSTRUCTION COMPANY, ) | |
|   ) | |
|    Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff CMARK brings claims pursuant to the Miller Act, 40 U.S.C. 3131, *et seq.*, and the Alabama Prompt Payment Act, Ala. Code, § 8-29-1, *et seq*. This action is presently before the court on CMARK's motion for summary judgment. Upon consideration of the motion, the court concludes that it is due to be granted in part and denied in part.

**Summary Judgment Standard**

A party seeking summary judgment bears the initial burden of demonstrating to the court the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions that it believes show an absence of any genuine issue of material fact. Hairston v. Gainesville Publishing Co., 9 F.3d 913 (11th Cir. 1993).

For summary judgment purposes, an issue of fact is "material" if it is a legal element of the claim, as identified by the substantive law governing the case, such that its presence or absence might affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248 (1986). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. Matsushita Electrical Industrial Company v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The court must view the evidence, and all factual inferences properly drawn from the evidence, in the light most favorable to the nonmoving party. Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992); Rollins v. TechSouth, Inc., 833 F.2d 1525, 1528 (11th Cir. 1987). It is improper for this court to weigh conflicting evidence or make credibility determinations; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255. Where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment." Barfield v. Brierton, 883 F.2d 923, 933-34 (11th Cir. 1989) (citation omitted).

> Where, [as is the case with regard to Conference America's breach of contract claim], the moving party will bear the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it must support its motion with credible evidence . . . that would entitle it to summary judgment unless the non-moving party, in response, come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.

Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993)(quoting United States v. Four Parcels of Real Property, 941 F.2d 1428, 1438 (11th Cir. 1991)(*en banc*)).

## Background[1]

Defendant Kelvin Thorington does business as Thorington Electrical & Construction Company ("TECC"), a sole proprietorship. (Thorington depo., pp. 10-11). The United States awarded TECC a contract for construction of a 10-lane bowling center at Gunter Annex, Maxwell Air Force Base. (See Plaintiff's Exhibits 3I, 3P; Exhibit A to Jones aff.).[2] On April 25, 2007, TECC accepted a bid submitted by CMARK to furnish and install kitchen equipment and furniture in the bowling center. (Defendant's Exhibit 6, Thorington Letter of Intent.)[3] CMARK did not submit a final, signed contract to TECC until September, 2007, a month and a half before the initial completion date of TECC's contract. (Id.; see also Plaintiff's Exhibit 3D).[4,5] The contract did not expressly state the due date for CMARK's

---

[1] The parties have raised no objections to the evidence filed in support of or in opposition to the motion for summary judgment. For purposes of the present motion, the court will consider any objections not expressly made to be waived. Davis v. Howard, 561 F.2d 565, 570 (5th Cir. 1977). However, the court cannnot consider documents which were filed without a supporting affidavit, and which are not identified as exhibits to depositions or otherwise as discovery or disclosure materials. See Fed. R. Civ. P. 56(c); CMARK Attachments 5, 8, and 9. As it is required to do, the court has viewed the evidence presented on the motion for summary judgment in the light most favorable to the defendant. Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992).

[2] The court refers to most of the exhibits as they were marked by the parties during depositions.

[3] Jack Whiteside, TECC's project manager on the bowling center job, states that "CMARK's representatives always knew the completion date for its contract was October 31, 2007." (Whiteside aff, ¶ 3). Whiteside is not competent to testify about what others knew or did not know. However, Karl Roblyer, CMARK's sales representative for the Central time zone and CMARK's Rule 30(b)(6) representative (according to defendant's brief), testified that CMARK was aware of the October 30th deadline. (Roblyer depo., pp. 6, 53).

[4] TECC sent the contract to CMARK in April and July 2007. When Whiteside inquired about the status of the contract, Chuck Nelson, CMARK's job site manager, said that CMARK had

performance. Instead, it provided:

> ARTICLE 2 EXECUTION AND PROGRESS OF THE WORK: Time is of the essence in the performance of this subcontract. *Subcontractor is aware of the Contract Time (as defined in Contract between Contractor and Owner). subcontractor agrees to take any and all steps necessary to ensure that the Work is performed in such time as to permit contractor to meet its obligations to Owner in accordance with the schedule for the Project to be prepared by Contractor (Work Schedule).* If subcontractor fails to maintain the progress required by the Work Schedule and such failure is Subcontractor's fault[,] in whole or in part, Subcontractor agrees, at its sole cost and expense to take whatever actions are necessary to get the Work back on schedule.
>
> Subcontractor represents that it has satisfied itself as to any provision in the Contract Documents concerning liquidated damages, and agrees that in the event liquidated damages are imposed by Owner or Contractor as the result in whole or in part of the performance or nonperformance of Subcontractor, such liquidated damages (or an appropriate share thereof) shall be charged to the Subcontractor. Subcontractor shall be granted an extension of time for delays [i]n the performance of the Work only to the extent an extension is allowed the Contractor by the Owner for performance of the Work.
>
> \* \* \* \* \*
>
> ARTICLE 8 DELAY: No extension of time shall be allowed unless Subcontractor submits a written request to Contractor within 48 Hours after the justifiable cause thereof occurs, and then only if and to the extent approved by

---

not received the contracts. In September 2007, Nelson told Whiteside that the contracts had been "lost" at CMARK's home office when one of CMARK's account managers either quit or was terminated. (Whiteside aff.). TECC includes a footnote in its opposing brief indicating that CMARK failed to provide the employee's full name and personnel record in response to discovery requests. (Doc. # 46, p. 2 n. 1). However, TECC has not filed a motion to compel such discovery and has filed no affidavit pursuant to Fed. R. Civ. P. 56(f). Therefore – even assuming that the employee's undisclosed name and personnel record are relevant to the issues before the court – CMARK's failure to provide the requested information in discovery is not.

[5] Whiteside's affidavit states that the signed contract was submitted on September 2008. (Whiteside aff., ¶ 5). This is clearly a typographical error. The parties signed the contract on or about September 18, 2007. (See Exhibit A to Jones aff.; see also Plaintiff's Attachment 4 and Defendant's Exhibit 5, both including the subcontract, marked "Plaintiff's Exhibit 20").

Contractor and Owner.

(Exhibit A to Jones aff.)(emphasis added).[6] The original completion date specified in TECC's contract with the Air Force was October 30, 2007. (See Plaintiff's Exhibit 3D, March 2, 2007 letter from contracting officer to TECC; Roblyer depo., p. 53).

On November 17, 2007, Whiteside e-mailed Chuck Nelson at CMARK. He indicated that TECC's contract on the bowling center "should have ended November 18, 2007," and that – had the government not added some work and extension days – TECC would have "gone into liquidated damages on that date."[7] Whiteside wrote that one reason was that equipment due from CMARK was not on site. He stated that "TECC's contract completion date is now . . . December 14, 2007 which does give us a little more time." Whiteside indicated that TECC would be asking for final inspection on December 11, 2007 and that the remainder of the equipment and furniture due from CMARK needed to be provided and installed. He asked that Nelson provide the status, in writing, for the delayed items. (Plaintiff's Exhibit 3I).

The minutes for a November 27, 2007 meeting between TECC and the government's contracting officials listed "installation of Kitchen equipment" as a critical issue. At that meeting Whiteside advised the attendees that "chairs would not be on site until sometime

---

[6] Neither party has filed a "Work Schedule" indicating that, at the time of contracting, CMARK was required to perform any earlier than sufficiently in advance of TECC's contract performance date to permit TECC to complete its obligation to the Air Force on time.

[7] The record before the court does not indicate the basis for the extension of the completion date from October 30th to November 18th.

around December 20, 2007." (Defendant's Exhibit 6).

On December 4, 2007, J.R. Jamerson, CMARK's Vice President of Operations, responded to Whiteside's request for a written equipment status letter. He indicated that "[t]he two most critical issues remaining as of [December 4, 2007]," were the chairs to be provided by Westin Nielsen and two foodservice items (#31 and # 33) to be provided by Randell Manufacturing. Jamerson explained that, although CMARK had written a purchase order for the chairs on September 20th, CMARK "found out on or about November 19th after a follow up as the anticipated delivery date was approaching that the order was lost in communication between Cmark and the manufacturer and was never processed[,]" that CMARK had "immediately engaged with Westin Nielsen to get the order processed," and that CMARK had agreed with Westin Nielsen on a December 20th "approximate shipment date." He further explained that CMARK sent the purchase order to Westin Nielsen and was notified that the specified finish on the chair frames was no longer available, requiring a new selection for the chair frame finish. He stated that CMARK had received the selection earlier that day and the order was "in process with Westin Nielsen now." Jamerson wrote that "[t]he purchase order for the two Randell items unfortunately had the same communication failure between [CMARK's] office and the factory and was again not found to be a problem until November 19th." He explained that CMARK had unsuccessfully sought alternate manufacturers to meet the delivery schedule; he had received shop drawings for the custom refrigerated units earlier that day [December 4, 2007] which had to be approved and returned to Randell before Randell would commit to a delivery date. Jamerson indicated that, due to

the complexity of the units and the holidays, the delivery date would likely be in mid-January 2008. (Jamerson letter, Plaintiff's Exhibit 3J).

On December 6, 2007, Whiteside e-mailed the government contracting officer asking for a 22-day extension, until January 4, 2008, for installation of a hot water heater. Whiteside indicated that TECC would then be finished with all work except for the equipment items (# 31 and # 33) due from CMARK. The contracting officer responded, "What are you prepared to offer for the contract extension?" (Defendant's Exhibit 4). On December 17, 2007 Thorington wrote to CMARK. He stated that TECC's contract completion date had been changed to January 4, 2007. Thorington stated that the final inspection date was December 28, 2007 and demanded that CMARK complete outstanding contract items by December 27, 2007. He further indicated that, if the government imposed liquidated damages on TECC, he expected that CMARK and any other company which had not completed its portion of the contract would share in the cost of the liquidated damages. (Plaintiff's Exhibit 3P).[8]

The minutes for the weekly construction meeting held the following day between TECC and the government contracting officials indicate that installation of kitchen equipment remained a critical issue. The minutes state, "CFCI equipment item # 31 Pass-Thru Refrigerated Base Counter w/ Overshelf Heat Lamps, and item # 33 Ice Cream Cabinet w/ Syrup Rail & Soda Draft Arms will not be onsite until around January 15, 2008.

---

[8] Another subcontractor, Bradley Plumbing and Heating – not a party to this action – also had not completed its portion of the contract. (Whiteside depo., pp. 76).

7

Contractor did not have a date as to when all Office Furniture would arrive on site. . . . Discussion took place over the importance of having equipment items # 31 & # 33 installed prior to acceptance. These pieces of equipment are essential to the operation of the Bowling Center." A fire department inspector refused to inspect the building before installation of the Randell units, stating that he could not inspect because those units were "a part of the equipment that's got to shut down with the shunt trip and the fire alarm system." (Thorington depo., p. 174).

On December 20, 2007, Thorington wrote to the base contracting officer, requesting that the final inspection be changed from December 28, 2007 to January 22, 2008. Thorington indicated that it would, by the date of the requested extension, have all work completed "to include the two pieces of equipment items which was [sic] delayed by our vender and manufacture [sic]." He added, "Should these two items in the kitchen be provided sooner then [sic] the requested final inspection date, TECC would request the final earlier. The final inspection would include all required testing such as the fire alarm systems." In exchange for the extension, Thorington offered certain items at cost, including keeping an inspection trailer on site, installing a fire department connection that was not clearly identified in the drawings and specifications, and ten willow oak trees. (Plaintiff's Exhibit 43). The government agreed to a contract modification which required Thorington to provide these items to the government at no additional cost in exchange for the extension. (Carruth depo., pp. 22-24; see also Plaintiff's Exhibit 30).

On January 22, 2008, the contracting officer sent a letter to TECC, advising that

8

liquidated damages in the amount of $488.35 per calendar day would be assessed for each day after January 22 until completion and acceptance of the construction. He required TECC to submit a written plan for expedited completion of the project to him by January 25, 2008. (Plaintiff's Exhibit 19)

CMARK submitted five invoices to TECC in the total amount of $179,418.68, representing the contract price less credits in the amount of $15,292.81 for installation work which Thorington had to perform. (Jones affidavit, ¶ 4; Plaintiff's Exhibit 4; see also Plaintiff's Exhibits 10 and 11, January 22-23, 2008 e-mail correspondence between Whiteside and Teresa Bialaszewski of CMARK). On November 30, 2007, CMARK issued an invoice which, after a credit requested by TECC in the amount of $6,160.00 for installation of hoods, was reduced by CMARK on January 22, 2008 to the total amount of $91,452.20.  (Id., Invoice 4284).  On December 17, 2007, CMARK issued an invoice for kitchen equipment which, after a credit requested by TECC in the amount of $5,132.81 due to TECC's installation of the kitchen sinks, was reduced by CMARK on January 23, 2008 to the total amount of $13,699.25  (Id., Invoice 4284A). Also on December 17, 2007, CMARK issued another invoice for furniture, which after a credit to TECC in the amount of $4,000.00 for installation of booths, was adjusted on January 22, 2008 to a total amount of $40,123.94.  (Id., Invoice 4285).  On January 21, 2008, CMARK issued two additional invoices – one for furniture, in the amount of $3,154.80, and another for the two custom "Randell" units, an ice cream cabinet and a "pass through" refrigerated unit, in the amount of $30,988.49.  (Id., Invoice 4285A, 4284B).  The date indicated on the invoices does not

reflect the date the items were delivered to the construction site; rather, it indicates the date on which the items were shipped. (Roblyer depo., p. 32).

On February 6, 2008, CMARK sent a letter to TECC's bonding agent, Travelers Casualty and Surety Company of America, notifying Travelers that TECC was in default and demanding payment in the amount of $179,570.72. The letter stated that "[i]nvoice numbers 4284 ($136,291.98) and 4285 ($43,278.74)[9] have been presented to Thorington on numerous occasions in accordance with the terms of the contract with no payment to date." (Exhibit C to Jones aff.).

The contract was completed on February 14, 2008, and the Air Force made its final payment to TECC, in the amount of $96,320.15 on February 22, 2008. (Plaintiff's Exhibit 15, 17).[10] On March 25, 2008, Whiteside sent an e-mail to Nelson, stating:

---

[9] These amounts include the amounts invoiced on 4284A, 4284B, and 4285A an additional amount of $152.04 not accounted for in the adjusted invoice.

[10] The total contract amount exceeded three million dollars; the Air Force had made fifteen partial payments to TECC previously. (Plaintiff's Exhibit 17). CMARK argues that "Thorington has not paid CMARK notwithstanding full payment by Maxwell to Thorington and notwithstanding Thorington's written certifications to Maxwell that he had paid all of his subcontractors and suppliers," citing Plaintiff's Exhibit 22. (CMARK brief, p. 4). The cited certification is dated January 4, 2008 – before two of the invoices at issue here were issued at all and before the other three were adjusted to remove billing for labor not performed by CMARK. (Plaintiff's Exhibit 22). CMARK did not file the portion of Thorington's deposition relating to this exhibit. The court has no basis for inferring that this January 4, 2008 certification pertained to the final invoice submitted by TECC to the Air Force on February 14, 2008; the court declines to draw the inference, on the present motion for summary judgment, that Thorington signed such a certification in conjunction with his final invoice. Additionally, CMARK has misstated the content of the certification. It does not state that Thorington "had paid all of his subcontractors and suppliers." Thorington certified that his request for payment "does not include and [sic] amounts which the prime contractor intends to withhold or retain from a subcontractor or supplier." (Plaintiff's Exhibit 22).

10

> This is to verify our conversation. I received a phone call this morning from the local freight company (SAIA) about delivering 3 cartons of chairs and 4 cartons of stools to the bowling center at Gunter. Per our conversation by phone these chairs are actually the ones that are in the specifications and will replace the one[]s already in the bowling center at Gunter? These chairs will be delivered between 9-11 AM or 1-4 PM on March 26, 2008. When do you plan to have the other chairs picked up?

(Plaintiff's Exhibit 3A). On March 31, 2008, Whiteside e-mailed Nelson again, asking, "Do you know when you're going to pick up the chairs? " (Id.). On April 3, 2008, the contracting officer e-mailed Whiteside. He stated, "Did you ever get an answer for the chair pick up? Need to get it done. They can[']t put the new ones out until they pick up the old ones." (Id.).

CMARK did not complete its performance until April 2008. (Whiteside aff.). According to Whiteside, TECC was forced to expend additional funds to avoid paying liquidated damages to the Air Force due to CMARK's failure to complete its work in a timely manner. Whiteside calculates the total cost attributed to CMARK's delays as $71,914.55. (Whiteside aff.).

## Discussion

CMARK claims that it is entitled to judgment against Thorington on its claims under the Miller Act[11] and the Alabama Prompt Payment Act in the full amount invoiced, plus

---

[11] CMARK's counsel cites the Miller Act, but includes no citation to any supporting case law in his argument for summary judgment on his Miller Act claim. In responding to the motion, Thorington's counsel relies primarily on *Black's Law Dictionary*, citing it four times. The better practice, in arguing in support of or opposition to motions, is for attorneys to cite case law – binding, if available, and persuasive, if not – applicable to the issues presented by the motions.

attorney's fees, expenses and costs of this action and prejudgment interest.[12]  Thorington responds that CMARK's performance of its obligations under the contract was not timely, and that he is entitled to recoup damages attributable to CMARK's delay.

The Miller Act provides, in part, that:

> Every person that has furnished labor or material in carrying out work provided for in a contract for which a payment bond is furnished under section 3131 of this title and that has not been paid in full within 90 days after the day on which the person did or performed the last of the labor or furnished or supplied the material for which the claim is made may bring a civil action on the payment bond for the amount unpaid at the time the civil action is brought and may prosecute the action to final execution and judgment for the amount due.

40 U.S.C.A. § 3133.  To establish a claim under the Miller Act, the plaintiff must establish "1) that materials were supplied for work in the particular contract at issue; 2) that the supplier is unpaid; 3) that the supplier had a good faith belief that the materials were for the specified work; and 4) that jurisdictional requisites are met." U.S. for Use and Benefit of Krupp Steel Products, Inc. v. Aetna Ins. Co., 831 F.2d 978, 980 (11th Cir. 1987)(citation omitted).  The evidence before the court does not demonstrate the existence of any material fact as to the *prima facie* elements of CMARK's Miller Act claim and, accordingly, CMARK is entitled to summary judgment as to liability.

While the Miller Act is intended to protect suppliers of labor and materials on public construction projects, the protection it affords is not absolute; the Miller Act does not

---

[12] CMARK, in its reply, advised the court that it released its claims against Travelers, TECC's surety on the payment bond, in consideration for Travelers' payment of $170,000.00 and acknowledges that Thorington is entitled to a credit under the payment bond in this amount.

preclude the assertion of defenses. Krupp Steel, 831 F.2d at 982-83; see also United Structures of America, Inc. v. G.R.G. Engineering, S.E., 9 F.3d 996 (1st Cir. 1993)(holding, in a Miller Act case brought by the supplier to a subcontractor, that the general contractor was entitled to recoupment of damages it incurred in curing defects in steel supplied by plaintiff); U.S. ex rel. Tennessee Valley Marble Holding Co. v. Grunley Construction, 433 F.Supp. 2d 104 (D.D.C. 2006)("It is well-settled that a contractor may assert recoupment as a defense to a supplier's breach of contract action when the contract breached is between the contractor and the supplier. . . . [even in the absence of privity], the supplier asserting a Miller Act claim is not entitled to more payment than that to which it is entitled in contract, and therefore the general contractor may assert a defense of recoupment against the supplier's Miller Act claim."); U.S. for the Use and Benefit of Hussman Corporation v. U.S. Fidelity and Deposit Company of Maryland, 999 F.Supp.734 (D.N.J. 1998)(surety entitled to raise recoupment claim in defense of Miller Act claim). In his answer to CMARK's amended complaint, Thorington asserted that he is entitled to set-off in the amount of $159,037.55; however, in response to summary judgment he produces evidence that he suffered damages attributable to CMARK's delay in the amount of $71,914.55 and argues that he is entitled to recoup this amount.

CMARK contends that its performance was timely because it completed its performance before the date of the last extension granted by the Air Force to TECC. However, the evidence before the court suggests that the need for an extension of the completion date to January 22, 2008 was required, at least in part, by CMARK's delay in

13

performing its obligations under the subcontract. CMARK bears the burden of proving that its own contract with TECC was modified to extend CMARK's date of performance. Huntsville Elks Club v. Garrity-Hahn Bldg. Co., 57 So. 750, 751 (Ala. 1911).[13] As noted above, CMARK's representative admitted that CMARK knew that the original completion date for the contract was October 30, 2007. (Roblyer depo., p. 53). The contract states, "Subcontractor shall be granted an extension of time for delays in the performance of the Work only to the extent an extension is allowed the Contract by the Owner for performance of the Work." (Subcontract, Article 2). However, it further provides that "No extension of time shall be allowed unless Subcontractor submits a written request to Contractor within 48 Hours after the justifiable cause thereof occurs, and then only if and to the extent approved by Contractor and Owner." (Subcontract, Article 8). CMARK has introduced no evidence that it submitted a written request for extension of time to Thorington, or that Thorington and the Air Force approved any such request for an extension by CMARK.[14]

Additionally, although timely performance may be waived, the evidence before the court does not demonstrate that Thorington did so in this case. By allowing CMARK to

---

[13] In resolving claims under the Miller Act, the effect of contract provisions is determined by applicable state law, except to the extent that construction of the Act is at issue. U.S. for the Use and Benefit of Seminole Sheet Metal Co. v. SCI, Inc., 828 F.2d 671, 675 (11th Cir. 1987); United States ex rel. Aucoin Electrical Supply Co. v. Safeco Ins. Co. of America, 555 F.2d 535, 541 (5th Cir. 1977). The contract indicates that the agreement was "made" in Mobile, Alabama, the contract was performed in Alabama, and there is no contrary choice of law provision in the contract; accordingly, Alabama law applies.

[14] The court finds CMARK's apparent contention that its deadline moved with any extension granted to TECC by the Air Force without merit.

continue its performance under the contract after CMARK's date for performance had passed, Thorington did not waive CMARK's breach of the contract. See Subcontract, Article 20 ("Failure or delay by Contractor to require performance of any provision of this Subcontract shall not be deemed a waiver of its right to enforce such provision, or a waiver of any other right."); Otinger v. Water Works and Sanitary Sewer Bd., 177 So.2d 320, 323 (Ala.1965)("Where a contract fixes the time for completion of work and makes time of the essence, the obligee does not waive nonperformance within the specified time by merely allowing the work to go on to completion after expiration of the time limit. A waiver must operate by way of an estoppel or be supported by a valuable consideration to be binding.")(citations omitted); Huntsville Elks' Club, 57 So. at 751; Belleview Cemetery Co. v. Faulk, 60 So. 461, 462 (Ala. App. 1912)("One for whom another contracts to do specified work within a certain time and in a designated manner does not, by allowing the work to proceed after the expiration of the time named and accepting the benefit of it, waive his claim to damages for the delay or for the contractor's failure to comply in other respects with his part of the contract, and, when sued on the contract, may recoup the damages sustained in consequence of such defaults on the part of the plaintiff.")(citations omitted); see also R.B. Boak & Co. v. U.S. Shipping Board Emergency Fleet Corp., 11 F.2d 523, 524 (5th Cir. 1926)(in a admiralty case, citing Huntsville Elks' Club for the proposition that "[a]cceptance of delayed performance is not inconsistent with the retention of the right to recover damages for the delay"). The court further declines, on the present motion, to construe Whiteside's e-mail statement to Nelson that "TECC's contract completion date is now the [sic] December

14, 2007 which does give us a little more time" or Whiteside's or Thorington's imposition of later deadlines on CMARK for completion of the contract as a waiver of Thorington's right under the contract to timely performance by CMARK. Cf. Robberson Steel Co. v. Harrell, 177 F.2d 12 (10th Cir. 1949)(holding, in a Miller Act case governed by Oklahoma law, that the contractor's letter to the supplier, after the due date had passed and demanding delivery within ten days of the letter, did not modify the performance date established by the contract nor did it waive the contractor's right to damages caused by the delay).

The contract between the parties provided that if CMARK failed to "prosecute the Work promptly and diligently to promote the progress of the Project," TECC may offset CMARK's obligation against any money due to it under the contract. (Subcontract, Article 15).[15] Although Whiteside's calculation regarding the amount of the delay damages attributable to CMARK is vague and somewhat suspect, in view of the evidence that Thorington first turned to the Air Force for payment of these delay damages, the court does not weigh credibility on a motion for summary judgment. There is sufficient evidence of record to demonstrate the existence of a genuine issue of material fact as to the amount CMARK is due; the evidence permits an inference that Thorington suffered some amount of

---

[15] There is, additionally, a provision pertaining to withholding of payment which is apparently incomplete and, accordingly, ambiguous. It reads, "Contractor reserves the right (i) to withhold payment from Subcontractor to satisfy liens against the Owner's property, or any actual or potential claims by Contractor against and any potential claimant, and (iii) to pay any such claimant directly for Work or Material supplied in performance of the Work." (Subcontract, Article 3). Alternate remedies available to TECC, not relevant here, were to pass on any liquidated damages assessed against TECC and attributable to CMARK (Subcontract, Article 2) or to terminate the contract for default (id., Article 15).

damages due to CMARK's delay. Accordingly, CMARK's motion for summary judgment is due to be denied as to the amount of damages.

The Alabama Prompt Payment Act, Ala. Code, § 8-29-1, *et seq.,* permits a contractor to withhold payment to a subcontractor of twice the amount subject to a *bona fide* dispute in some circumstances, including unsatisfactory work progress. See Ala. Code, § 8-29-4; see also Tolar Construction Co., LLC v. Kean Elec. Co., 944 So.2d 138 (Ala. 2006). CMARK received no payment at all from Thorington. It is apparent that CMARK is entitled to judgment on this claim in some amount; however, the record before the court is not sufficient to establish the amount.[16]

## CONCLUSION

For the foregoing reasons, it is ORDERED that plaintiff's motion for summary judgment (Doc. # 39) is GRANTED as to liability and DENIED as to damages on both of plaintiff's claims against Thorington.

Done, this 29th day of October, 2010.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE

---

[16] CMARK has briefed the issues regarding its state law claim inadequately; it notes Thorington's failure to bill it for Thorington's delay damages, but provides the court with no legal authority or argument regarding the effect of Thorington's failure to formally provide a bill or notice in a timely manner, *e.g.*, whether, under applicable state law or other persuasive authority, Thorington's failure to do so precludes Thorington from asserting any defenses in a civil action brought under the Prompt Payment Act.